Vista Food Exchange, Inc. v. Comercial de Alimentos Sanchez

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2023

(Argued: February 13, 2024                    Decided: July 24, 2025)

Docket No. 22-2660

_____

VISTA FOOD EXCHANGE, INC.,

*Plaintiff-Appellant,*

- v. -

COMERCIAL DE ALIMENTOS SANCHEZ S DE R L DE C.V.
doing business as COMERCIAL SANCHEZ,

*Defendant-Appellee.*[*]

_____

Before: KEARSE, PARK, and ROBINSON, *Circuit Judges.*

---

[*]     The Clerk of Court is instructed to amend the official caption to conform with the above.

Appeal by plaintiff wholesale food supplier from a judgment of the United States District Court for the Southern District of New York, Ronnie Abrams, *Judge*, dismissing its complaint against defendant principally for breach of contract by failing to pay for over $750,000 worth of meat products purchased from plaintiff. Following cross-motions for summary judgment, the district court denied plaintiff's motion; it granted defendant's motion and dismissed the breach-of-contract claim, ruling (1) that defendant proffered unrefuted evidence that it had paid the invoiced amounts in cash to plaintiff's salesman in Tijuana, Mexico, and thereby fulfilled its contractual obligations notwithstanding invoice instructions to make payments to plaintiff's headquarters in New York; and (2) that even if cash payments directly to the salesman constituted a breach of the terms of payment in the parties' contract, plaintiff could not show that its damages were proximately caused by the breach because the salesman's thefts of the money were unforeseeable. The court dismissed plaintiff's other claims--for breach of implied contract, promissory estoppel, and unjust enrichment--on the ground that New York law forecloses such claims when there was an enforceable contract between the parties. *See* 627 F.Supp.3d 408 (S.D.N.Y. 2022). On appeal, plaintiff contends principally that the district court erred (a) in concluding that the parties' contract--without a modification sufficient to satisfy

the statute of frauds, *see* N.Y. U.C.C. §§ 2-201, 2-209--permitted defendant to pay plaintiff by giving cash to the salesman; (b) in admitting and crediting hearsay evidence that defendant made such cash payments; and (c) in finding that the salesman's theft of the cash was unforeseeable.

We conclude that, while the district court did not err in denying summary judgment in favor of plaintiff, the grant of summary judgment dismissing its breach-of-contract claim was inappropriate in light of genuine disputes of material fact as to defendant's claimed performance, the claimed modification of the contract, and the foreseeability of damages. In light of the record, we vacate so much of the judgment as dismissed plaintiff's claims for breach of contract and unjust enrichment, and remand for trial with respect to those claims. We affirm the dismissal of plaintiff's claims for implied contract and promissory estoppel.

Affirmed in part, vacated in part, and remanded.

JONATHAN C. SCOTT, Dallas, Texas (Jonathan C. Scott, P.C., Dallas, Texas, on the brief), *for Plaintiff-Appellant*.

JACOB C. COHN, New York, New York (Peter G. Siachos, Jolene Sproviero, Gordon & Rees, New York, New York, on the brief), *for Defendant-Appellee*.

KEARSE, *Circuit Judge*:

Plaintiff Vista Food Exchange, Inc. ("Vista"), a wholesale food supplier, appeals from a judgment of the United States District Court for the Southern District of New York, Ronnie Abrams, *Judge*, dismissing its complaint against defendant Comercial De Alimentos Sanchez S De R L De C.V. ("Comercial Sanchez" or "Sanchez"), principally alleging breach of contract in Sanchez's failure to pay for over $750,000 worth of meat products purchased from Vista. Following cross-motions for summary judgment, the district court denied Vista's motion; it granted Sanchez's summary judgment motion and dismissed the breach-of-contract claim, ruling (1) that Sanchez proffered unrefuted evidence that it had paid the invoiced amounts in cash to Vista's salesman in Tijuana, Mexico, and thereby fulfilled its contractual obligations, notwithstanding invoice instructions to make payments to Vista's headquarters in New York; and (2) that even if cash payments directly to the salesman constituted a breach of the terms of payment in the parties' contract, Vista could not show that its damages were proximately caused by that breach because the salesman's thefts of the money were unforeseeable. The court dismissed Vista's other claims--for breach of implied contract, promissory estoppel, and unjust enrichment--on the ground that New York law forecloses such claims when there was

-4-

an enforceable contract between the parties. On appeal, Vista contends principally that the district court erred (a) in concluding that the parties' contract--without a modification sufficient to satisfy the statute of frauds, *see* N.Y. U.C.C. §§ 2-201, 2-209--permitted Sanchez to pay Vista by giving cash to the salesman; (b) in admitting and crediting hearsay evidence that Sanchez made such cash payments to the salesman; and (c) in finding that the salesman's theft of the cash was unforeseeable to Sanchez.

For the reasons that follow, we conclude that, while the district court did not err in denying summary judgment in favor of Vista, the grant of summary judgment dismissing its breach-of-contract claim was inappropriate in light of genuine disputes of material fact as to Sanchez's claimed performance, the claimed modification of the contract, and the foreseeability of damages. In light of the record, we vacate so much of the judgment as dismissed Vista's claims for breach of contract and unjust enrichment, and remand for trial with respect to those claims. We affirm the dismissal of its claims for implied contract and promissory estoppel.

## I. BACKGROUND

A few material facts are not genuinely in dispute. Vista was a corporation in the business of purchasing and selling wholesale foods, primarily fresh and frozen meat products. Its headquarters were in Bronx, New York. Sanchez, domiciled in Mexico, was a buyer, seller, and importer of meat products. In mid-2011, Sanchez applied to Vista for a line of credit and became a customer of Vista, with a credit account.

From 2011 until early 2015, Sanchez bought several million dollars' worth of meat products from Vista. Sanchez placed its orders for those products through Eduardo Andujo Rascón ("Rascón" or "Rascon"), a Vista salesman who was assigned to Vista's New Hampshire office but was based in southern California. In 2015, Vista informed Sanchez that Vista had not received payment for Sanchez orders placed in January through November of 2014, that the balance due on Sanchez's account exceeded its credit limit, and that Vista was suspending acceptance of orders from Sanchez. Sanchez, in response, maintained that it had in fact paid for the 2014 orders in question by delivering cash to Rascón.

Vista commenced the present action in 2018 and filed an amended complaint in 2020, alleging principally that Sanchez had breached its contract with Vista, which required Sanchez to make its payments to Vista's headquarters in Bronx, New York.

A. *Sanchez's Motion for Summary Judgment*

Sanchez moved for summary judgment, contending that it had paid for all of its 2014 purchases from Vista by delivering cash to the Vista salesman Rascón in Tijuana. In support of that contention, Sanchez submitted principally sworn declarations by Fernando Sánchez Hernández ("Fernando") and his brother Humberto Sánchez Hernández ("Humberto")--co-owners of Sanchez--and Sanchez employee Argelia Lizárraga Beltrán; an affidavit from Rascón; and various documents. Its principal submission was the Declaration of Fernando Sánchez Hernández dated September 7, 2021 ("First Fernando Decl.").

Fernando began by describing operational features of Sanchez's business, including customer relations, monetary exchange rates between United States dollars and Mexican pesos, and banking currency restrictions and conditions, the combination of which made it disadvantageous for Sanchez to bank its cash receipts

and resulted in its having an excessive amount of cash. (*See id.* ¶¶ 3-12, 21-26.) Fernando said that Rascón, becoming aware of these circumstances, "*then* began giving us personalized attention." (*Id.* ¶ 27 (emphasis added).)

> 28. Rascón . . . informed us that *Vista could receive payments by* check, wire transfer, or *cash. I checked with Vista* whether such payment methods were permissible, *and Vista said* it was no problem as long as we bought more merchandise from Vista.

> 29. During one of his visits to Sanchez's office, Rascón spoke with [Omar Torres Sortillon, a broker who was assisting Sanchez with the importation process] and the issues regarding paying suppliers abroad and dealing with the cash deposit restrictions with Mexican banks came up. Rascón commented that he *already* informed Sanchez that *he could accept dollars in cash as payments for Vista's bill* and that Vista had no problem receiving cash and USD as long as Sanchez does not decrease its average purchase volume per month.

> 30. *Rascón then approached me* and said he . . . *was aware of Sanchez's cash problem*, and would gladly consult with Vista as to *whether Vista would accept cash for its invoices*.

> 31. *The next day, Rascón* called me and *told me that Vista authorized receiving payments in cash for its invoices*.

(First Fernando Decl. ¶¶ 28-31 (emphases added); *see id.* ¶ 9.)

1. *Sanchez's Description of Cash Deliveries to Rascón in 2013*

Fernando said that, in light of Rascón's most recent statement, Sanchez "*proceeded to make sample* cash payments to determine whether such method of payment was safe and reliable." (First Fernando Decl. ¶ 31 (emphasis added).) He described four sample cash deliveries, and a total of 12 cash deliveries, to Rascón between July 2013 and mid-January 2014 "cover[ing] Vista's invoice[s]" with respect to 19 Vista invoices. (First Fernando Decl. ¶¶ 32-46). For example:

> 32. Sanchez's *first payment* with cash to Vista was made on July 12, 2013. The first cash payment was paid to Rascón in the amount of $28,972.80 USD in cash, which covered Vista's invoice dated May 10, 2013 with invoice number 3415091 in the amount of $28,972.80 USD. Humberto Sanchez ("Humberto") delivered the cash payment to Rascón at the offices of [Sanchez].

> 33. After Vista credited the payment, and we saw there was no problem with the first cash payment, we proceeded to make the second payment.

(First Fernando Decl. ¶¶ 32-33 (emphasis in original).) Fernando set out similar details as to the "*second payment*" on August 7, 2013, a "*third payment*" on September 26, 2013, and a "*fourth payment*" on October 5, 2013 (*id*. ¶¶ 34-36 (emphases in original)). Fernando said that "Vista credited all four" of those "payments," and

> [w]hen we saw that four months had passed and we did not have any issues with Vista crediting our payment to these, invoices

which we paid to Rascón in cash, we continued to carry out such practice.

(*Id*. ¶¶ 37-38.)

Fernando stated that "[c]ommunications with Vista were . . . always through Rascón, and cash payments for Vista's invoices were always made to Rascón." (*Id*. ¶ 51.) He reiterated that

*[w]hen the first cash payment was successful, we made the second, third, and fourth payments. Based on the success of the first four cash transactions*, Sanchez believed it would be prudent to keep paying in cash, hence payments five through twelve.

(*Id*. ¶ 50 (emphasis added).)

Sanchez also submitted declarations by Humberto and Beltrán, who described their respective cash deliveries to Rascón. Each of those declarants stated the dates on which they had delivered to Rascón a specific amount of money "cover[ing]" Vista invoices with specific dates and numbers. (*E.g.*, Declaration of Humberto Sánchez Hernández dated September 3, 2021 ("First Humberto Decl."), ¶ 9 ("On August 7, 2013, I made a cash payment to Rascón in the amount of $21,384.00 USD in cash, which covered Vista's invoice dated July 18, 2013 with invoice number 3415092."); *id*. ¶¶ 8, 10-14 (describing six additional such deliveries with respect to seven invoices); Declaration of Argelia Lizárraga Beltrán dated September 3, 2021

-10-

("First Beltrán Decl."), ¶¶ 4-8 (describing five such deliveries with respect to 11 invoices).)

Fernando and Humberto stated, *inter alia*, that Fernando had requisitioned the cash for these deliveries, and that Humberto or Beltrán then signed vouchers when they received the cash. (*See, e.g.*, First Fernando Decl. ¶¶ 53-55; First Humberto Decl. ¶¶ 3-4.) Humberto said:

> I was the person in charge of the payment area. I authorized the supplier payments when they were made via wire and cash. Under my command was Argelia Lizarraga Beltran, who was the other person authorized by me to make any large cash payments when it was needed and I was unable to do it.
>
> . . . .
>
> 5. All the money for security reasons was always delivered in places owned or rented by us, this [*sic*] places where [*sic*]:
>
>     a. . . . Sanchez . . . offices;
>
>     b. . . . a branch of . . . Sanchez . . . that functions as a supermarket; and
>
>     c. My home address, this was due to security reasons and where I felt it was safe.
>
> 6. This procedure was implemented for security reasons due to the volume of money delivered . . . .

(First Humberto Decl. ¶¶ 3, 5-6). With regard to his first delivery of cash to Rascón, Humberto stated that he made the "cash payment to Vista Foods through its agent Rascón." (*Id*. ¶ 8.)

For each of the 19 invoices that Sanchez claims it paid by means of those 12 cash deliveries to Rascón in July 2013-January 2014, "cover[ing]" amounts due Vista, Fernando's declaration attached documents that were numbered 00001-00061 (Sanchez's "61-page compendium," *see* First Fernando Decl. Exhibit B (Appendix on appeal ("A.") 58-118)). The 61-page compendium included copies of Fernando's cash requisitions and of vouchers signed by Humberto or Beltrán to receive the cash from Sanchez's treasury. It also included copies of invoices that Fernando stated or implied were issued by Vista (hereafter, the "Sanchez 2013 'invoices'"), but that do not match the invoices in Vista's business records. (*See* Parts I.B. and II.C.2. below.) Sanchez contended that this evidence as to Sanchez's payments to Vista in 2013 established that cash payments to Rascón in Tijuana had become a method that was accepted by Vista for Sanchez's payments for its purchases from Vista.

## 2. *Sanchez's Evidence as to Cash Delivered to Rascón in 2014*

Fernando's declaration stated that Sanchez also had evidence, in the form of an affidavit from Rascón, that Sanchez had delivered cash to Rascón for all of the invoices at issue in this action, *i.e.*, the unpaid invoices from 2014. Fernando stated that

> [o]n March 25, 2015, Rascón, under protest to tell the truth, stated that "as a sales representative in this city, of Vista . . . , I have received the cash payment of 39 invoices from the company called [Sanchez], protested what was necessary and established its [*sic*] signature, in the document, in the presence of [a specified] Public Notary . . . ."

(First Fernando Decl. ¶ 73.) A copy of the Rascón affidavit in Spanish, with a list of 39 invoices, was attached as an exhibit to Fernando's declaration. An English translation of the affidavit was attached to a declaration by Sanchez's attorney.

Rascón's affidavit was dated March 25, 2015. He had been fired by Vista on March 24, 2015. Rascón died some time in 2016. Sanchez first revealed a copy of Rascón's affidavit to Vista in 2018.

3. *Sanchez's Summary*

Urging the court "to not permit Vista to blame us for Vista's employee's theft of our monies" (First Fernando Decl. ¶¶ 91-92), Fernando summarized Sanchez's contentions, in pertinent part, as follows:

a. Comercial Sanchez utilized a reliable method of cash to pay certain Vista invoices from July 2013 through January 2014, which were made to Rascón, credited by Vista, and are not being claimed by Vista as not being paid. Exhibit B.

b. Comercial Sanchez continued this cash payment method for other Vista invoices (the ones that Vista is now suing us on) from January 2014 through November 2014. Exhibit E.

c. Comercial Sanchez did not know that Rascón had stopped remitting these payments to his company, Vista.

d. Rascón signed a notarized statement attesting to all of the payments for the disputed invoices having been made to him.

(First Fernando Decl. ¶ 91(a)-(d); *see id*. Exhibits E and G.)

B. *Vista's Opposition to Sanchez's Summary Judgment Motion*

In opposition to Sanchez's motion for summary judgment, Vista submitted sworn declarations from its President Vincent L. Pacifico and its chief financial officer (or "CFO") Alan Butterfass, along with copies of numerous invoices

-14-

Vista had sent to Sanchez and reports of wire transfers it had received from Sanchez. Butterfass, who had been Vista's CFO since 2002 and "manage[d] the Vista New York office where invoices were generated or customer payments and wire confirmations were received" (Declaration of Alan Butterfass dated April 23, 2021 ("First Butterfass Decl."), ¶¶ 1, 8), submitted several declarations.

Butterfass's first declaration was submitted in response to a pretrial order of the district court. (*See* D.Ct. Dkt. 72, Dec. 28, 2020 ("December 28, 2020 Order").) That order dealt with various discovery motions, and included a requirement that Vista search for and produce any "[d]ocuments showing Vista's acceptance of cash payments from Sanchez, in particular, a list of the 2013 Transactions" referred to in a submission Sanchez's attorney made to the court. (*Id.*; *see also* D.Ct. Dkt. 68.) The submission by Sanchez's attorney requested that Vista produce Vista's invoices and payment records related to specific invoices referenced by invoice number, date, and amount, which corresponded to the 2013 invoices included in Sanchez's 61-page compendium. Butterfass stated that he had caused and participated in the required search, that he had reviewed the Sanchez 61-page compendium, and that Vista had in its records no invoices that matched the Sanchez 2013 "invoices." (*See* First Butterfass Decl. ¶¶ 14, 21, 24.) He stated that the documents Sanchez proffered "ha[d]

-15-

been altered." (*Id*. ¶ 24.) He also reported that the search of Vista's records--electronic and paper--"*failed to uncover a single instance in which Vista received and accepted cash payments from Sanchez* as alleged in Sanchez's counsel's letter." (*Id*. ¶ 2 (emphasis added); *see id*. ¶ 23 ("[*n*]*or did Vista's 2021 search and review . . . uncover a single solitary receipt issued by Vista's corporate office to Comercial Sanchez acknowledging its tender and Vista acceptance of cash payments* for these earlier transactions Sanchez claims to have made to Vista") (emphases added).)

Butterfass stated that Vista also had no record that Sanchez had ever requested a change of payment method:

> Th[e] search failed to locate any communications between Sanchez and Rascon or any electronic documents concerning *arrangements for Sanchez to pay its invoices in cash in Mexico*, concerning *whether the salesman was authorized to receive such payments* or indicating that such payments were ever received or accepted by Vista.

> 4. As the Chief Financial Officer, I am certain that if such an arrangement had ever been proposed to me or Vista management by Sanchez, Vista would never had [*sic*] approved it. Sanchez never had Vista's permission to make payments other than as provided for on the invoices.

(*Id*. ¶¶ 3-4 (emphases added).)

Butterfass stated that "[t]hrough the years, Comercial Sanchez purchased over $5 million (in US Dollars) in wholesale food products from Vista," and that *"[e]very invoice that Vista sent to Comercial Sanchez had instructions to remit payment to Vista's corporate office in the Hunts Point Co-op Market in Bronx, New York.* Comercial Sanchez was provided with Vista's wire coordinates and *it regularly wired payments to that account.*" (*Id*. ¶¶ 7, 9 (emphases added); *see, e.g.,* Declaration of Alan Butterfass dated December 6, 2021 ("Third Butterfass Decl."), ¶ 13 ("Sanchez' payment method was periodic wires that were sent to Vista's corporate office bank coordinates in New York.").) "Throughout the relationship" between Vista and Sanchez, "Comercial Sanchez would routinely pay Vista for product by wire to Vista in New York to its designated bank account. Comercial Sanchez sent periodic payments on account rather than separate payments for a single particular invoice." (First Butterfass Decl. ¶ 11; *see id*. Exhibit 1, attaching "examples of incoming wires received by Vista from Comercial Sanchez over the years").

Butterfass stated that although Sanchez placed its Vista orders "through the salesman on the account, Eduardo Andujo Rascon" in Tijuana, "[i]n that role the salesman sold product to customers." (*Id*. ¶ 8.) The "invoices were generated" and "customer payments and wire confirmations were received" in Vista's New York

office, which Butterfass managed; "Rascon never worked in the New York office." (*Id.*)

As described in greater detail in Part II.C. below, Butterfass elaborated on Rascón's role, and on Vista's payment practices, in subsequent declarations. Rascón "was a salesman and not a corporate officer. He was not employed in the corporate office that handles financial matters involving customer accounts, amounts due or balances." (Declaration of Alan Butterfass dated September 10, 2021 ("Second Butterfass Decl."), ¶ 10.). Throughout the period when Vista had dealings with Sanchez, Rascón was a Vista salesman whose "job responsibilities did not include making credit decisions, opening accounts, issuing invoices, or making contracts or agreements on behalf of Vista." (Third Butterfass Decl. ¶ 14.) Vista did "not allow salespeople to make decisions with a customer to change payment terms or payment locations or available credit." (*Id.* ¶ 26.)

Butterfass also pointed out that "[a]t no time during the period from 2011 to 2015 did Vista have a branch office in Mexico . . . . Thus, it would not have been safe or prudent to allow a customer to pay invoices in cash in Tijuana, Mexico to a salesman (as Sanchez argues)--over 2800 miles from Vista's bank in New York." (*Id.* ¶ 19.)

As described in greater detail in Part II.C.2. below, Butterfass stated that Vista had no record of Sanchez ever requesting authorization to pay its Vista bills by delivering cash to Rascón. He stated that he received no such request or inquiry, and that

> [i]f someone from my office had been contacted by Comercial Sanchez to request that Vista modify its payment terms, the call would have been referred to me but this never happened.

(*Id*. ¶¶ 20, 33; *see also id*. ¶ 32 (if Sanchez had "ever" even "raised an objection" to "the terms stated in Vista's invoices," "I would have known about it but this never happened.").)

Vista's President Pacifico similarly declared that no one had ever asked him whether Sanchez should be allowed to pay for its purchases from Vista by delivering cash to Rascón. He stated, *inter alia*, that throughout the time that Vista sold meat products to Sanchez, "Vista's written terms of sale were the same," in that "every invoice designated Vista's corporate office for New York for payment." (Declaration of Vincent L. Pacifico dated December 5, 2021, ¶ 15.) Pacifico stated that

> [a]t no time in the years 2013 or 2014 was I ever notified by Sanchez that it intended to or claimed that it have [*sic*] made cash payments to Rascon in Tijuana, Mexico.

-19-

14. No one from Sanchez ever contacted me in 2013 or 2014 to propose that Vista change its written terms of sale. Vista never changed its written payment terms that required the customer to pay Vista in New York.

(*Id*. ¶¶ 13-14.)

C. *The District Court's Grant of Summary Judgment to Sanchez*

In an Opinion and Order dated September 13, 2022, reported at 627 F.Supp.3d 408 ("*Vista I*"), the district court granted Sanchez's motion for summary judgment dismissing Vista's breach-of-contract claim. It concluded that Vista had failed to adduce any evidence that Sanchez's payments to Rascón were insufficient to fulfill its contractual obligations to Vista. It also ruled that even if Sanchez's conduct constituted a breach of contract, Vista failed to prove that the breach caused Vista's damages, because theft by Rascón was an intervening cause that was unforeseeable to Sanchez.

The court noted that each side had moved for summary judgment in its favor and that "[w]hen evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences

against the party whose motion is under consideration." *Vista I*, 627 F.Supp.3d at 415.

In each instance,

> [t]he moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id*. In doing so, it "must provide more than conclusory allegations ... and show more than some metaphysical doubt as to the material facts." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Opals on Ice Lingerie, Designs by Bernadette, Inc. v. Bodylines, Inc.*, 320 F.3d 362, 371 (2d Cir. 2003).
>
> The Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). It will grant summary judgment only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995).

*Vista I*, 627 F.Supp.3d at 415.

1. *Finding a Lack of Breach*

Among the evidence the district court found admissible, despite Vista's objection, were the declarations of Humberto and Beltrán describing deliveries of

cash to Rascón for payment of Vista invoices during the last six months of 2013, along with the 61-page compendium of invoices, vouchers, and requisitions for cash from Sanchez's treasury--all of which Vista had moved to exclude on the ground that it had not been disclosed until after the end of the discovery period. The district court denied Vista's motion to strike, finding that the delay was harmless, and that the declarations and documentary evidence "contain highly probative evidence on the issue of payment." *Vista I*, 627 F.Supp.3d at 417.

The court also found that the affidavit of Rascón was admissible, despite Vista's objection on the ground that it was hearsay. The court noted that the affidavit itself could not be admitted as the statement of an opposing "party"--*see generally* Fed. R. Evid. 801(d)(2) (defining as "not hearsay" the statement of a party when offered by an opposing party)--because it had been signed after Rascón was fired by Vista. *Vista I*, 627 F.Supp.3d at 418. However, the court ruled that the acknowledgements handwritten on the attached invoices--"RECIBIDO" (or "RECEIVED")--could be considered statements by Vista because they

> were all marked as "paid" and signed by Rascón at a time when he was
> still employed by Vista. The statements were also *made within the
> scope of that employment relationship,* as *it is undisputed that Rascón
> was the sales agent responsible for the Sanchez account and all Sanchez-*

*Vista communications took place through him.  See* First Fernando Decl. ¶ 51.

*Id*. (emphases added).

The court also found that although Rascón's affidavit was not admissible as a statement by a party opponent, it was admissible under Rule 804(b)(3)(A), which

> permits the admission of a statement by an "unavailable" witness, where the statement is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency . . . to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A).

*Vista I*, 627 F.Supp.3d at 418.  The court had no doubt that Rascón's death rendered him "unavailable" within the meaning of Rule 804(a)(4).  And it was persuaded that

> Rascón's admission that he had "received the payment in cash of 39 invoices from [Sanchez]" was sufficiently damaging so as to fall within the ambit of this exception.  By March 25, 2015, Sanchez had already been made aware that the hundreds of thousands of dollars in cash it had paid to Rascón in satisfaction of Vista's invoices had not, in fact, made their way back to Vista.  Although Rascón did not go so far as to admit to stealing the cash payments in his affidavit, his admission that he had taken the cash could have exposed him to civil or criminal liability for theft; at the very least, such an admission would have been "probative" in a case against him.  The affidavit is thus admissible as a statement against interest.

*Id*. at 419.

As to the merits of Vista's contention that Sanchez breached its contract by handing cash to Rascón in Tijuana rather than delivering any form of payment to Vista in New York, the court found that Sanchez's contention that it "paid each of the disputed invoices in cash to Vista's sales agent, Rascón, without knowledge that Rascón had not in turn remitted the money back to his employer" was "supported by the declaration submitted by Fernando." *Id*. at 419. It cited Fernando's assertions that Sanchez had "*utilized a reliable method* of cash to pay certain Vista invoices from July 2013 through January 2014, which were made to Rascón," that Sanchez had simply "continued *this cash payment method* for [the disputed invoices] from January 2014 through November 2014," and that "*Sanchez did not know* that Rascón had stopped remitting these payments to his company, Vista." *Id*. at 419-20 (emphases added).

The court found that Sanchez's assertion that it had paid its invoices by delivering cash to Rascón was "further supported by the declaration of Humberto Sanchez, who attested to physically delivering to Rascón large sums of cash on seven occasions--amounting to approximately $160,000 in total--at Sanchez's corporate office or at his home," and by the declaration of Beltrán, "who ha[d] worked for the company for over 10 years, . . . that she personally paid Rascón over $200,000 in cash across five separate deliveries in 2013 and 2014." *Id*. at 420. The court found that the

-24-

61-page compendium submitted by Sanchez with respect to the cash deliveries described by Humberto and Beltrán was "*central* to the dispute surrounding *whether Sanchez actually paid* the [2014] invoices at issue--the 'focal point' of this litigation." *Id*. at 417 (emphases added). It stated (*but see* Part II.C.3. below) that

> [a]pproximately half of these 61 pages are made up of the signed *commercial invoices attached to* Rascón's affidavit . . . . The other half consists of internal "cash requests" and "cash vouchers" that correspond to *those invoices*, which document Sanchez's process of retrieving cash from the company's treasury.

*Id*. (emphases added). The court stated that "Sanchez's assertion that it paid the invoices is further bolstered, of course, by Rascón's admission under oath that he received cash payment from Sanchez in satisfaction of the 39 disputed invoices, and by Rascón's signature on said invoices." *Id*. at 420.

The court also stated that even if it excluded "Rascón's affidavit and the signed invoices" from evidence, its "decision on the parties' cross-motions for summary judgment would remain unchanged . . . in light of the substantial amount of other--uncontested--evidence in the record supporting the fact of Sanchez's payment." *Id*. at 420 n.6. It stated:

> Critically, Vista does not offer any *evidence of its own* to contradict Sanchez's assertion that it "has paid in full all 39 invoices at issue in this lawsuit," Def.'s 56.1 Stmt. ¶ 79. It *does not*

*claim* that Sanchez did not actually pay Rascón, *that Rascón was not an agent of Vista*, that Sanchez was aware of Rascón's alleged theft, or that Rascón did not steal the cash.

627 F.Supp.3d at 420 (emphases added); *see also id*. at 419 (noting that even if the 61-page compendium and the declarations of Humberto and Beltrán were all excluded from evidence as Vista requested, their absence "would not . . . impact[] the Court's overall determination on the parties' motions for summary judgment because *Fernando Sanchez's declaration provides an independent and undisputed evidentiary basis to grant summary judgment to Sanchez*" (internal quotation marks omitted) (emphases ours)).

2.  *Finding a Lack of Foreseeability*

As to Vista's contention that Sanchez had breached the contract simply by making its payments in Mexico rather than New York, the court noted that only damages that "'actually follow or may follow from the breach of the contract' may be awarded; if they 'may be so remote as not to be directly traceable to the breach, or they may be the result of other intervening causes . . . then they cannot be allowed.'" *Id*. at 421 (quoting *Wakeman v. Wheeler & Wilson Manufacturing Co.*, 101 N.Y. 205, 209, 4 N.E. 264, 266 (1886)).  The court noted that, although ordinarily issues of proximate

-26-

cause and foreseeability are questions for the jury, in this case it saw "no evidence in the record that Sanchez could have reasonably foreseen that by paying Rascón in cash, it would expose Vista to theft-related damages," *Vista I*, 627 F.Supp.3d at 421. It concluded that "no reasonable jury could find that Sanchez's breach was the proximate cause of Vista's injury--as opposed to the *unforeseeable* and illegal act of a third party, Rascón," and that Sanchez is therefore "entitled to summary judgment on the breach of contract claim." *Id*. (emphasis added).

The court also dismissed Vista's alternative claims of breach of implied contract, promissory estoppel, and unjust enrichment, in light of New York law ruling such claims untenable when the parties' conduct has been governed by an actual contract and neither party contends that the contract is not valid and enforceable. *See Vista I*, 627 F.Supp.3d at 422 (citing *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011)).

## II.  DISCUSSION

On appeal, Vista contends principally that the district court erred (1) in accepting Sanchez's claim that its delivery of cash to Rascón in Tijuana satisfied its

contractual obligations; (2) in failing to find that the statute of frauds foreclosed Sanchez's claim that an oral agreement by Vista to accept cash delivered to its salesman in Tijuana supplanted the parties' original agreement for payments to Vista in New York; and (3) in ruling that Rascón's theft of the cash delivered by Sanchez for Vista was unforeseeable as a matter of law. For the reasons that follow, we find merit in these contentions.

A. *Summary Judgment Principles*

Principles governing consideration of motions for summary judgment--and governing appellate review of decisions on such motions--are well established:

> A motion for summary judgment may properly be granted--and the grant of summary judgment may properly be affirmed--only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(c)(2).

*Porter v. Dartmouth-Hitchcock Medical Center*, 92 F.4th 129, 147 (2d Cir. 2024). The district court noted that "[a] fact is material if it 'might affect the outcome of the suit under the governing law,'" and that "a dispute is genuine if, *considering the record as*

-28-

*a whole*, a rational jury could find in favor of the non-moving party." *Vista I*, 627 F.Supp.3d at 415 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis ours)).  As the district court noted, "[t]he Court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant," and when there are cross-motions, these principles are applicable to each party's motion, considered on its own merits.  *Vista I*, 627 F.Supp.3d at 415 (internal quotation marks omitted).

In addition, "'[t]he evidence of the non-movant is to be believed*, and all justifiable inferences are to be drawn in his favor,'" *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) ("*S. Katzman*") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255 (emphasis ours))--"'even though contrary inferences might reasonably be drawn,'" *S. Katzman*, 999 F.3d at 877 (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 (1962)).  "'The function of the district court in considering the motion for summary judgment is *not to resolve disputed questions of fact but only to determine whether*, as to any material issue, a genuine factual dispute exists.'" *Rupp v. City of Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024) ("*Rupp*") (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (emphasis in *Rupp*)).

In considering whether such a fact issue exists, the court is not to make credibility determinations or weigh the evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

*Rupp*, 91 F.4th at 634 (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)). Indeed, while "'the court should review the record as a whole, it *must disregard all evidence favorable to the moving party that the jury is not required to believe*.'" *Lara-Grimaldi v. County of Putnam*, 132 F.4th 614, 633 (2d Cir. 2025) (quoting *Reeves*, 530 U.S. at 151 (intermediate quotation marks omitted) (emphasis in *Grimaldi*)).

B. *Substantive Law Principles*

1. *Contracts*

"To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 525 (2d Cir. 2004). In New York, Article 2 of the Uniform Commercial Code ("UCC") governs disputes concerning contracts for the sale of goods. *See, e.g.*, *Rogath v. Siebenmann*, 129 F.3d 261, 263 (2d Cir. 1997).

Under the UCC, "a contract for the sale of goods for the price of $500 or more is not enforceable *by way of action or defense* unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." N.Y. U.C.C. § 2-201(1) (McKinney 2024) (emphasis added). In contracts between merchants, "a writing in confirmation of the contract and sufficient against the sender" satisfies the writing requirement so long as, *inter alia*, the writing is received "within a reasonable time" and "the party receiving it has reason to know its contents." *Id*. § 2-201(2). "Where a contract involves repeated occasions for performance and opportunity for objection 'any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement' (UCC § 2-208[1])." *CT Chemicals (U.S.A.) Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 179, 613 N.E.2d 159, 162 (1993).

"Once a contract is formed, the parties may of course change their agreement by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel." *Id*. However, "[t]he requirements of the statute of frauds section of this Article (Section 2-201) must be satisfied if the contract as modified is within its provisions." N.Y. U.C.C. § 2-209(3). "'Modification' for the future cannot therefore be conjured up by oral testimony if the price involved is

-31-

$500.00 or more since such modification must be shown at least by an authenticated memo." *Id*. cmt.; *see Creative Interiors, Inc. v. Epelbaum*, 2009 WL 2382986, at *2 (N.Y. Sup. Ct. Richmond Co. July 30, 2009) ("*Creative Interiors*") (noting that "[a] disputed contract for an amount more than $500 must comply with the Statute of Frauds which requires that the contract must be memorialized in a writing" regardless of whether the claim may be evaluated either as a modification of the existing contract or as a new contract).

Purchase orders and invoices can represent contracts for the sale of goods. *See, e.g., Quality Packaging Supply Corp. v. R.H. Carlson Co.*, 158 A.D.2d 936, 936, 551 N.Y.S.2d 99, 99 (4th Dep't 1990). Where "[t]he invoice [i]s on the letterhead of the seller and contain[s] the names and addresses of the buyer and the seller; the date thereof; the payment terms, the price of the goods; a description of the goods; the amount of goods and the total price of the sale," and "[n]o written notice of objection to its contents [i]s given within 10 days after it [i]s received," the "invoice constitute[s] a writing in confirmation of the contract pursuant to [UCC § 2-201] subdivision (2), and thus satisfie[s] the formal requirements of subdivision (1)." *B & R Textile Corp. v. Domino Textiles, Inc.*, 77 A.D.2d 539, 539-40, 430 N.Y.S.2d 89, 90 (1st Dep't 1980) (internal quotation marks omitted)).

As to a plaintiff's entitlement to damages for a breach of contract, the damages must have been proximately caused by the breach. As the district court noted, and as discussed further in Part II.C.5. below, a plaintiff may not be entitled to recover damages if they were caused not by the defendant's breach but rather by an intervening cause that was unforeseeable to the defendant.

2. *Agency*

Under New York law, agency is "a fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act." *Faith Assembly v. Titledge of New York Abstract, LLC*, 106 A.D.3d 47, 58, 961 N.Y.S.2d 542, 550 (2d Dep't 2013) (internal quotation marks and citation omitted). An agent can bind a principal only for such acts as are within the agent's express, implied, or apparent authority. *See id*.

"The scope of an agent's actual authority is determined by the intention of the principal or, at least, by the manifestation of that intention to the agent." *Wen Kroy Realty Co. v. Public National Bank & Trust Co. of New York*, 260 N.Y. 84, 89, 183 N.E. 73, 74 (1932) ("*Wen Kroy*"). "An agent has actual authority to take action designated

or implied in the principal's manifestations to the agent and acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act." *Restatement (Third) of Agency* § 2.02(1) (2006). "The general rule is that an agent employed to do an act is deemed *authorized to do it in the manner in which the business entrusted to him is usually done*." *Wen Kroy*, 260 N.Y. at 89-90, 183 N.E. at 74 (internal quotation marks omitted) (emphasis ours).

Apparent authority may exist when, although the principal has not manifested consent to another to act for him, "words or conduct *of the principal, communicated to a third party*, . . . give rise to the appearance and *belief* that the agent possesses authority to enter into a transaction." *Hallock v. State of New York*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513 (1984) ("*Hallock*") (emphases added). "[T]he existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentation of the agent *because of some misleading conduct on the part of the principal*--not the agent." *Id*. (internal quotation marks omitted) (emphasis ours). "*The agent cannot by his own acts imbue himself* with apparent authority." *Id*. (emphasis added). And "a third party with whom the agent deals may rely on an *appearance* of authority *only to the extent that such reliance is reasonable*." *Id*. (emphases added).

"[W]here no written authority of the agent has been proven, questions of agency and of its nature and scope" are questions for the factfinder. *Hedeman v. Fairbanks, Morse & Co.*, 286 N.Y. 240, 248-49, 36 N.E.2d 129, 133 (1941).

C. *The Record in the Present Case*

Applying these standards, we conclude that the district court's analysis failed to recognize genuine disputes of fact as to (1) Rascón's authority to modify the agreement on Vista's behalf, (2) Sanchez's claim of an oral agreement modifying payment terms, (3) whether there was in 2013 a course of dealing by the parties that modified the payment terms or estopped Vista from objecting to Sanchez's cash payments directly to Rascón, (4) whether Sanchez actually paid the disputed 2014 invoices by cash to Rascón, and (5) the foreseeability of Rascón's theft.

1. *The Nature of Rascón's Authority as Vista's Agent*

In granting summary judgment to Sanchez on Vista's breach-of-contract claim, the district court stated principally that

> Vista does not offer any evidence of its own to contradict
> Sanchez's assertion that it "has paid in full all 39 invoices at issue
> in this lawsuit," Def.'s 56.1 Stmt. ¶ 79. It *does not claim* that

Sanchez did not actually pay Rascón, *that Rascón was not an agent of Vista*, that Sanchez was aware of Rascón's alleged theft, or that Rascón did not steal the cash.

*Vista I*, 627 F.Supp.3d at 420 (emphases added). The troublesome aspect of that analysis is the treatment of the issue of agency. The linchpin of the district court's acceptance of Sanchez's claim to have "paid" the 2014 invoices at issue in this case is the proposition that Rascón was Vista's agent for purposes of receiving payments by Sanchez and was authorized to receive cash from Sanchez in Tijuana. That proposition is squarely in dispute.

In stating that Vista "d[id] not claim . . . that Rascón was not an agent of Vista," *Vista I*, 627 F.Supp.3d at 420, the district court focused solely on Vista's introductory statement in its response to Sanchez's Rule 56.1 Statement ¶ 79 assertion that Sanchez had paid the 39 invoices at issue in this lawsuit. That introduction by Vista--stating that Sanchez "has provided no competent proof that Vista was paid under its terms of sale. [Sanchez] alleges that it gave money to Rascon but waited until he died to bring forward its supposed backup documentation"--was argumentative and would be a permissible inference, in light of the facts that Sanchez insisted throughout that it had paid its 2014 Vista bills by giving cash to Rascón and that it expressed "huge interest" in continuing to do business with Vista in an email

from Humberto in May 2015, but did not disclose Rascón's supporting affidavit of March 25, 2015 to Vista until after Rascón had died.

But that argument was followed by factual assertions and citations to several paragraphs of the Third Butterfass Declaration, which the district court did not mention in discussing summary judgment, and which included the following:

> Vista's "invoices always designated Vista's corporate office in New York for payment remittances"; and

> Vista "*never* instructed or *authorized Comercial Sanchez to make payments to our former salesman Rascon instead of paying Vista in New York*."

(Third Butterfass Decl. ¶ 16 (emphases added).) This paragraph of the Third Butterfass declaration had in fact been cited by the district court earlier in its opinion, *see Vista I*, 627 F.Supp.3d at 413 ("Vista . . . maintains that it never authorized Sanchez to make cash payments to Rascón."). And as to Sanchez's nonpayment, a prior Butterfass declaration stated that

> *Sanchez failed to make payment to Vista for thirty-nine orders for completed orders for wholesale meat during the period from January 2014 to November of 2014* as required under the terms of the parties' agreement;

> . . . .

-37-

*Sanchez never wired payment for the thirty-nine purchases* here to Vista bank coordinates at Vista's New York bank . . . . *Sanchez never remitted payment to Vista's payment address. It never issued a check, a bank check or a money order payable to Vista on any of these purchases*."

(Second Butterfass Decl. ¶¶ 16, 21 (emphases added).) Further, as to Rascón's role at Vista, the Butterfass declarations stated that

Rascón "was a salesman and not a corporate officer. He was not employed in the corporate office that handles financial matters involving customer accounts, amounts due or balances" (Second Butterfass Decl. ¶ 10);

Throughout the period when Vista had dealings with Sanchez, Rascón was a Vista salesman; *Rascón's "job responsibilities did not include* making credit decisions, opening accounts, issuing invoices, or *making contracts or agreements on behalf of Vista*" (Third Butterfass Decl. ¶ 14) (emphases added);

Rascón "was simply a salesperson," who was assigned to Vista's New Hampshire office; he "never worked in the New York corporate office where all Vista financial matters [we]re handled under my supervision" (*id*. at ¶¶ 24-25);

"Any Vista contract with a customer or arrangement that is out of the ordinary course, including any customer requested deviation from the standard terms of sale, may only be made by Vista corporate officers. Any such arrangements would then be documented in writing by Vista and sent to the customer" (*id*. ¶ 14); and

*Vista did "not allow salespeople to make decisions with a customer to change payment terms or payment locations or available credit" (id. ¶ 26 (emphasis added)).*

While the Second Butterfass declaration was attached to Vista's own motion for summary judgment against Sanchez, it could not properly be disregarded by the district court in considering Sanchez's motion, as "the court must review the record 'taken as a whole,'" *Reeves*, 530 U.S. at 150 (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Most company employees do not have authorization to act for their employers in every aspect of the business. The above declarations from Vista sufficed to provide evidence that Vista required that Sanchez make its payments to Vista in New York; that Vista's corporate office in New York handled financial matters involving customer accounts; that Rascón did not work in Vista's New York office; that Rascón was simply a salesperson, not a corporate officer, and not an employee who handled payment accounts; and that changing Vista's payment terms or locations was not within the scope of Rascón's authority.

Indeed, while Sanchez asserted that all communications between Sanchez and Vista took place through Rascón (*see* First Fernando Decl. ¶ 51)--which was accepted by the district court, *see Vista I*, 627 F.Supp.3d at 413--that assertion was

not evidence that Rascón was authorized by Vista to accept cash payments for Vista's sales. And in fact, the proposition that Rascón was--or even that he was viewed by Sanchez as--an agent of Vista for that purpose is inconsistent with Sanchez's own proffered evidence. Fernando's declaration stated that when Rascón "informed us that *Vista could receive payments by . . . cash*[,] *I checked with Vista . . . .*" (First Fernando Decl. ¶ 28.)

Thus, although as discussed in Part II.B.2. above, the authority of an agent may be actual or apparent, the descriptions of Rascón's role by Butterfass, Vista's chief financial officer, in charge of its payments receivable operation from 2002 through 2021, foreclose any ruling as a matter of law that Rascón had express or implied authority to accept or agree to payments from Sanchez in cash. And Fernando's description of his immediate impulse to "check[]" with Vista indicates that the prior "words or conduct of" Vista had not "give[n] rise to the appearance"--or to a "belief" by Sanchez--that Rascón "possesse[d] [apparent] authority," *Hallock*, 64 N.Y.2d at 231, 485 N.Y.S.2d at 513, to accept cash from Sanchez in payment of Vista invoices. Questions as to the nature and scope of Rascón's agency should have been left for the jury to decide.

## 2. *Sanchez's Claim of an Oral Agreement Modifying Payment Terms*

Sanchez urges us, however, to affirm the grant of summary judgment because, it argues, that "[h]ere, *the uncontroverted evidence is that there was an actual oral agreement between the parties to accept cash payments*." (Sanchez brief on appeal at 31 (emphasis added).) This contention is meritless. The "parties" are Sanchez and Vista, not Sanchez and Rascón; Vista's President and its CFO have declared under oath that Vista had no such oral agreement with Sanchez; and Sanchez's own submissions contain no admissible evidence that there was such oral agreement.

The sections offered in the Fernando declaration to support such a contention (set out more fully in Part I.A. above) are the following:

> 28. Rascón . . . informed us that *Vista could receive payments by* check, wire transfer, or *cash. I checked with Vista* whether *such payment methods* were permissible, *and Vista said it was no problem* . . . .

> 29. During one of his visits to Sanchez's office, Rascón spoke with Sortillon . . . . Rascón commented that he *already* informed Sanchez that *he* could accept dollars in cash as payments for Vista's bill and that Vista had no problem receiving cash and USD . . . .

> 30. *Rascón then approached me and said he* had spoken with Sortillon, was aware of Sanchez's cash problem, and *would . . . consult with Vista as to whether Vista would accept cash for its invoices*.

31.   *The next day, Rascón called me and told me that Vista authorized receiving payments in cash for its invoices.*

(First Fernando Decl. ¶¶ 28-31 (emphases added).)   The deficiencies in this declaration to show the existence of an oral agreement include the following.

To the extent that Fernando suggests in paragraph 28 that Sanchez and Vista reached the alleged oral agreement by means of a communication between Fernando and "Vista," his assertion is entirely conclusory.  First, his declaration does not say whether such a communication was written or oral; however, given that no writing is provided or cited, the implication is that it was oral.  Second, Fernando does not identify, either by name or by position, a Vista person with whom he spoke. Third, the declaration does not specify the question Fernando claims to have posed to whatever Vista person he may have reached.  It says that he "checked" after Rascón referred to "methods"--plural--by which "*Vista* could receive payments," including cash; but "I checked" does not disclose whether Fernando asked--in the language attributed to Rascón--whether all three payment methods were acceptable, or whether Vista as a company could accept payments in cash, or most specifically, whether Vista would approve Sanchez's making its payments by handing cash to Rascón. Nor does the declaration state that Fernando asked whether the agreed locus

for payments could be changed from New York to Tijuana. Fourth--even assuming that Fernando had identified the Vista employee with whom he purports to have spoken--in the absence of specificity as to what question Fernando asked, the laconic "no problem" response that he attributes to "Vista" is indecipherable.

Moreover, the Fernando declaration's description in ¶¶ 29-30 of the sequence of events after his "check[ing] with Vista" suggests that the claimed "no problem" response did not in fact result in the oral agreement that Sanchez now claims. Those two paragraphs state that after Rascón had "already" told Sanchez that "he" could receive cash payments, Rascón "*then* approached [Fernando]" and volunteered to "*consult with Vista as to whether* Vista would accept cash payment for its invoices" (*id*. ¶¶ 29-30 (emphases added)). If the claimed "no problem" response to Fernando's "check[ing]" had meant that Vista had agreed that Sanchez could make its payments by handing cash to Rascón, no such subsequent consultation would have been necessary. And even Rascón's report as to the outcome of his "consult[ation]" with Vista--as described in ¶ 31--was inconclusive as to the crucial aspects of Sanchez's claimed agreement, for the declaration's final paragraph in the described sequence states that "Rascón . . . told me that Vista *authorized receiving*

-43-

*payments in cash* for its invoices" (*id*.), without stating that the "receiv[er]" would be Rascón.

Such vague and conclusory descriptions by Fernando of Vista's supposed agreement that Sanchez could make cash payments to Rascón--either when he "checked with Vista" or when Rascón reported on his own "consult[ation]" with Vista cannot be a basis for the court to grant Sanchez summary judgment.

On the other hand, the above paragraphs of Fernando's declaration lend support to Butterfass's declaration that Rascón lacked authority--actual or apparent-- to speak for Vista with respect to how payments could be made. If Fernando indeed "checked with Vista" for verification that the cash payments Rascón said were "permissible" were in fact permissible, the very making of the inquiry indicates that Sanchez did not believe that Rascón's representations about such cash payments were within his authority. And from Fernando's statements that--even after he had "checked with Vista" (and reportedly received a "no problem" response (to some question))--Rascón himself (a) volunteered to "consult with Vista as to whether Vista would accept cash for its invoices" and (b) reported back that "Vista authorized receiving" cash, but with no mention of Rascón as the person receiving, it is inferable that Rascón lacked authority to state that he could receive such payments.

-44-

Finally, even if Fernando's declaration had been factual rather than conclusory, and if the two contractual modifications that Sanchez claims--cash payments to be made (a) to Rascón and (b) in Mexico--had been discussed and orally agreed on between Sanchez and Vista, such an agreement would have needed to be reduced to writing in order not to run afoul of the Statute of Frauds. Sanchez's argument that the Statute of Frauds does not require that a place-of-payment term be in writing is irrelevant. It is clear that the agreement was for Sanchez to continue to purchase more than $500 worth of Vista merchandise--making the Statute of Frauds applicable--and the UCC provides that "[t]he requirements of the statute of frauds section of this Article (Section 2-201) must be satisfied *if the contract as modified* is within its provisions," N.Y. U.C.C. § 2-209(3) (emphasis added); *see, e.g., Creative Interiors*, 2009 WL 2382986, at *2 (noting that "[a] disputed contract for an amount more than $500 must comply with the Statute of Frauds which requires that the contract must be memorialized in a writing" regardless of whether the claim may be evaluated either as a modification of the existing contract or as a new contract).

### 3. *Parties' Course of Dealing as to Payment Method*

As indicated in Part II.B.1. above, the UCC provides that if a contract involves repeated occasions for performance and opportunity for objection, a "course of performance accepted or acquiesced in without objection" may be considered in order to determine the meaning of the agreement. N.Y. U.C.C. § 2-208(1). In addition to claiming that there had been an oral agreement permitting the delivery of cash to Rascón in payment of its bills to Vista, Sanchez argues that

> the parties had an established a [*sic*] course of dealings whereby Vista accepted numerous payments by cash to Rascón in Tijuana, thereby waiving any purported contractual requirement for payment by another method (wire) or at another location (Vista's headquarters).

(Sanchez brief on appeal at 22-23.) Sanchez, which does not claim that it made any cash payments to Vista before July 2013, submitted its 61-page compendium that included 19 invoices bearing 2013 dates (which we will call the "Sanchez 2013 'invoices'") along with the declarations of Humberto and Beltrán citing those numbered invoices as Vista charges for which they say they delivered cash to Rascón. Sanchez argues that "Vista's conduct in accepting cash payments [in 2013] created a course of dealings, and amounted to a waiver of any other purported payment

-46-

method requirement that was relied upon by Sanchez, and that Vista is estopped from contending otherwise." (*Id*. at 31.)

Preliminarily, we note that the district court viewed the Sanchez 2013 "invoices" in the 61-page compendium as "central" to the matter of whether Sanchez paid the disputed 2014 Vista invoices, and treated the 2013 "invoices" as reliable, stating that they were attached to Rascón's affidavit. *See Vista I*, 627 F.Supp.3d at 417 ("Approximately half of the[] 61 pages are made up of the signed commercial invoices attached to Rascón's affidavit . . . ."). In so doing, the court confused the two groups of invoice documents submitted by Sanchez. The only "invoices" in Sanchez's 61-page compendium are documents bearing dates in 2013. Rascón's affidavit attached only the Sanchez versions of the 2014 invoices at issue here. Nonetheless, the 2013 "invoices" are material to Sanchez's contention that the parties' contract was altered by their course of conduct in the fall of 2013, and we consider them in that respect.

Fernando asserted that Vista "credited" the 2013 cash payments. (*See, e.g.*, First Fernando Decl. ¶¶ 33, 37, 47, 91(a).) But he cited no receipt, no statement of account, nor any other document by Vista that showed credits for payments by Sanchez in cash. Fernando's assertions that "Vista credited" Sanchez's claimed 2013

-47-

cash payments are wholly conclusory, and the district court's acceptance of those assertions was flawed, both legally and factually.

First, as a matter of principle, while there were sworn declarations by Humberto and Beltrán that they delivered cash to Rascón for 2013 invoices on a dozen occasions, specifying, *inter alia*, the dates, the dollar amounts, and the Vista invoice dates and numbers to which they attributed those monies, the district court's acceptance of those assertions as true was warranted only in its consideration of the motion by Vista for summary judgment against Sanchez. With respect to Sanchez's own motion for summary judgment in its favor, if a jury would be entitled to disbelieve such testimony by Humberto and Beltrán, the district court was required to disregard their assertions.

Second, we think it clear that the sworn declarations submitted by Vista at least raised genuine issues as to whether it received the cash described in Sanchez's 61-page compendium. Butterfass stated that after Sanchez began its credit account with Vista in mid-2011, all of the payments it received from Sanchez arrived through wire transfers to Vista's New York bank; Butterfass attached copies of three such wire transfers that Vista received from Sanchez in the second half of 2013. He stated that the wire transfers were not ascribed to specific invoices, and that Vista has no record

of ever receiving a payment from Sanchez in cash. (*See, e.g.*, Second Butterfass Decl. ¶ 14; Third Butterfass Decl. ¶ 4.)

Third, Butterfass stated that he had reviewed the Sanchez 2013 "invoices," and he disputed that they were Vista invoices. (*See* First Butterfass Decl. ¶ 24.) Vista submitted, from its regularly maintained business records (*see* Business Records Declaration of Alan Butterfass dated December 6, 2021 ("Fourth Butterfass Decl."), ¶¶ 2-4), printouts of more than 100 invoices it had sent to Sanchez in 2013-2015 (*see id*. Exhibit A (A.445-619)). As described in Part I.B. above, all are on Vista letterhead, and all--immediately below the letterhead and a line with telephone and fax numbers--say "PLEASE REMIT TO: [Vista's address in] Bronx, NY." (*See id*.) Butterfass stated, in responding to the district court's December 28, 2020 order requiring Vista to search its files with regard to Sanchez's 61-page compendium, that the numbered invoices that Sanchez included "do not match" the invoices in Vista's records that bear those numbers. (First Butterfass Decl. ¶ 24.)

Comparison of the invoices submitted by Sanchez and Vista respectively amply supports Butterfass's assertion of "[mis]match" in several ways, including the following. With respect to each pair of those documents that bear the same invoice number ("same-numbered 2013 invoices"), nearly half of the Sanchez 2013 "invoices"

show an invoice date different from the date on the Vista invoice. (*See*, *e.g.*, Invoice "3415092": *Compare* A.63 (Sanchez) *with* A.460 (Vista).) Further, while the product description in each pair of same-numbered 2013 invoices appears to refer to the same kind of product, the language of the descriptions themselves differs. (*See*, *e.g.*, Invoice "3415355": *Compare* A.67 ("Fresh Chicken Leg Quarters") (Sanchez), *with* A.472 ("O.K. Foods Leg Quarters") (Vista).) This is true of virtually all of the same-numbered 2013 invoices submitted by Sanchez and Vista. Moreover, some of the Sanchez 2013 "invoices" do not match the same-numbered Vista invoices as to the price of the product and the total amounts charged. (*See*, *e.g.*, Invoice "3415425": *Compare* A.97 (Sanchez) *with* A.479 (Vista).)

Most importantly, while all of the invoices in Vista's own records are on Vista letterhead, nearly half of the invoices in Sanchez's 61-page compendium are on pages headed "COMMERCIAL INVOICE"--which are forms with rectangular boxes and vertical lines separating columns ("COMMERCIAL INVOICE forms")--a format matching none of Vista's invoices. Further, while the Sanchez 2013 "invoices" using the COMMERCIAL INVOICE forms include most of the transactional information that appears in the Vista invoices, they do not have a Vista letterhead; rather Vista's name and address appear on the left of the document, a space normally occupied by

-50-

the name and address of the addressee. And none of the COMMERCIAL INVOICE forms includes the Vista invoices' instruction to make payment to Vista in New York.

There is no doubt that the theory of repeated acceptance of cash payments by Vista in 2013 was "central" to Sanchez's contention that it satisfied its contractual obligations to Vista by paying in cash the 2014 invoices. But the center collapsed. While Sanchez's 61-page compendium contains copies of cash requisitions by Fernando and vouchers for that cash by Humberto and Beltrán, those documents themselves do not reveal what became of that cash. The only evidence in the record that Sanchez gave Rascón cash for any 2013 invoices is the declarations of Humberto and Beltrán; but for nearly half of the supposed cash deliveries, the dates of the "invoices" they cite do not match the dates on the same-numbered Vista invoices.

Finally, while the Sanchez 2013 "invoices" have payment-received notations of "RECIBIDO" (*i.e.*, "RECEIVED"), we have seen no statement in the record by Rascón that he signed them. Nor do the declarations of Humberto and Beltrán, punctilious in stating other details, state either that when they met with Rascón to deliver the cash they had the "invoices" with them for Rascón to acknowledge the cash payments, or that they had Rascón mark "RECEIVED" on the "invoices" at some

-51-

other time. And Sanchez did not proffer any statement by Rascón himself that he in fact received any cash payments for Vista's 2013 invoices.

In sum, we note at least ten reasons for concluding that the Sanchez 2013 "invoices" (a) may lack authenticity--a flaw that itself impedes Sanchez's claim of a modification agreement with Vista--and (b) are insufficient to show as a matter of law that Sanchez in 2013 delivered cash to Rascón that Vista accepted and credited:

■ Half of Sanchez 2013 "invoices" do not match the same-numbered Vista invoices' invoice dates.

■ Some do not match Vista invoices' product price.

■ None matches the language used for the product description.

■ Half are COMMERCIAL INVOICE forms, not Vista letterhead.

■ The COMMERCIAL INVOICE forms lack Vista's payment instructions.

■ Humberto and Beltrán do not say that they had Rascón sign receipts for cash that they say they delivered to him.

■ **Rascón did not say he received cash for any 2013 invoices**.

■ *Vista has no record of ever receiving any payment from Sanchez in cash.*

-52-

■ Sanchez proffered no documents showing the crediting of cash by Vista.

■ ***Vista proffered copies of wire transfers from Sanchez, received during the period in which Sanchez claims to have paid only in cash.***

Given this record, Sanchez has not established that a factfinder would be compelled to find a course of dealing by the parties--*i.e.*, its claim of consensually paying Vista for the last six months of 2013 by delivering cash to Rascón in Tijuana--through its presentation of the 61-page compendium that includes (a) 2013 "invoices" that do not match Vista invoices, and (b) declarations of Humberto and Beltrán that they made deliveries of cash to Rascón who did not state that he received that cash.

Finally, we note that in denying Vista's motion to exclude, *inter alia*, Sanchez's 61-page compendium and the declarations of Humberto and Beltrán, the district court stated that

> even if these motions to strike were granted *in whole or in part*, such ruling would not have impacted the Court's overall determination on the parties' motions for summary judgment because *Fernando Sanchez's declaration provides an independent and undisputed evidentiary basis to grant summary judgment to Sanchez,*

*Vista I*, 627 F.Supp.3d at 419 (internal quotation marks omitted) (emphases ours). We have two difficulties with this view that Fernando's declaration alone warranted summary judgment on the ground of payment. First, the court had found that the evidence that Sanchez had begun paying Vista by delivering cash to Rascón in 2013 was "central" to Sanchez's claim that it also made such payments in cash for 2014; and indeed, without the declarations of Humberto and Beltrán, there was no competent evidence that Sanchez made such payments in 2013. The statements in the Fernando declaration that Sanchez made cash payments to Rascón in 2013 are plainly hearsay. Fernando does not state either that he made any of those payments or that he was present when such payments were made.

Second, the district court's conclusion that Fernando's declaration is sufficient to warrant summary judgment means that the court found Fernando's assertions to be credible; but assessments of credibility, as discussed in Part II.A. above, are beyond the scope of the court's authority in deciding a motion for summary judgment. A reasonable jury could find Fernando's key factual statements (and the factual statements of Humberto and Beltrán) not credible. And as discussed in this section, much of Fernando's declaration as to purported agreements by Vista was so conclusory as to be insufficient to support Sanchez's contention.

4. *Evidence as to Whether Sanchez Paid the 2014 Vista Invoices by Giving Cash to Rascón*

The evidence proffered by Sanchez to prove that it paid the disputed 2014 Vista invoices is the reverse image of the evidence it proffered for its claim of 2013 cash payments. First, whereas Sanchez proffered no statement from Rascón that he received any of the alleged 2013 cash payments, it presented an affidavit from Rascón stating that he received cash payments for the 39 disputed 2014 invoices. Rascón's affidavit, as translated into English, states, in toto, as follows:

> The undersigned, EDUARDO ANDUJO RASCON, by my own right and under oath, I declare that, as sales representative of the company VISTA FOOD EXCHANGE INC in this city, I received the payment in cash of 39 invoices from the company named COMERCIAL DE ALIMENTOS SANCHEZ, SOCIEDAD DE RESPONSABILIDAD LIMITADA DE CAPITAL VARIABLE and which contain the following details[.]

(Affidavit of Eduardo Andujo Rascón dated March 25, 2015 (as translated), *see* A.198.) The "details" consist of an attached list of 39 numbered invoices, with three columns, headed "INVOICE," "DATE RECEIVED," and "AMOUNT."

And second, whereas for its claimed deliveries of cash in 2013, Sanchez submitted 19 requisitions and 19 vouchers for the claimed cash payments, as well as the declarations from Humberto and Beltrán which, for each of the 19 claimed cash

-55-

payments, itemized the invoice number, the invoice date, the amount of cash, and the date and the location of the delivery, Sanchez submitted no such information with respect to the disputed 2014 invoices. In connection with the Sanchez 2014 invoice documents, there is no statement that Fernando filed any "cash request[s]," no declarations by Humberto or Beltrán that they signed vouchers to collect requisitioned cash, and no declaration by them--or anyone else--that they actually delivered cash to Rascón with respect to the disputed invoices. For proof of its claim that it paid the 2014 invoices in cash, Sanchez relied solely on the Rascón affidavit.

The district court ruled that Rascón's affidavit was not admissible under Evidence Rule 801(d)(2) as a statement of an opposing party because it was dated after Rascón had been fired by Vista, but was admissible under Rule 804(b)(3)(A) as a statement against his interest, given that it exposed him to civil or criminal liability. *See Vista I*, 627 F.Supp.3d at 418-19. And the court ruled that the invoices attached to the affidavit were themselves admissible as statements of an opposing party, finding that they "were all marked as 'paid' and *signed by Rascón at a time when he was still employed by Vista*." *Id*. at 418 (emphasis added).

With respect to the admission of the invoices submitted by Sanchez as attachments to Rascón's affidavit, we have several difficulties with the court's

assessment of those documents as evidence that Sanchez paid the disputed 2014 Vista invoices. First, the court's statement that Sanchez's 2014 invoice documents were "*signed by Rascón at a time when he was still employed by Vista*" seems to be an assumption based solely on the fact that the documents bear handwritten dates next to the "RECEIVED" notation. But the mere presence of the word and the date does not reveal when they were placed on the documents. Although Rascón stated in his affidavit that he had received in cash the amounts due for the 39 invoices now in dispute, and a list was attached, his affidavit, quoted above, does not say that he personally marked them as paid; and even if he personally wrote on the invoices "RECEIVED," his affidavit does not state that he did that on the date shown. If in fact Rascón marked them as paid at the same time that he made his affidavit--which was after he had been fired by Vista--those "RECEIVED[s]," like his affidavit, would not be admissible as statements of an opposing "party." It may or may not be unusual for a written acknowledgement that an invoice had been paid on a certain date to be provided at a later date; but what was extremely unusual was Rascón's providing, on the day after being fired, a written document stating under oath that he had in fact received in cash what amounted to more than $750,000 that belonged to his employer.

Nothing in this unusual record precludes the possibility that Rascón both gave his affidavit and marked each payment "RECEIVED" on that same day.

Second, even assuming that the "RECEIVED[s]" were written before Rascón was fired, it is an open question of fact whether their writing can properly be attributable to Vista. As discussed earlier, there is ample evidence that acceptance of payments was not within the scope of Rascón's authority as Vista's salesman. And if Rascón had no authority to accept such payments, his representation that he accepted them cannot bind Vista.

Third, while it may have been within the district court's discretion to rule the Sanchez 2014 invoice documents admissible as statements attributable to Vista-- with the factual questions as to the scope of Rascón's authority remaining to be decided by the jury--neither the documents nor the Rascón affidavit itself would compel a reasonable jury to find that Sanchez had satisfied its contractual obligations to Vista by delivering cash to Rascón. The following discrepancies in the documents themselves could persuade a jury to disbelieve Sanchez's assertions that it delivered to Rascón all, or any, of the amount Sanchez owed Vista.

The jury, by comparing the documents submitted by the respective parties, could see numerous differences between the invoices in Vista's business

records and the 39 invoice documents presented by Sanchez. To begin with, all but two of the Sanchez 2014 invoice documents (like nearly half of Sanchez's 2013 "invoices") are "COMMERCIAL INVOICE" forms (or "COMMERCIAL forms")--rather than Vista invoices. The COMMERCIAL forms are not documents on Vista letterheads and, as described in Part II.C.3. above, they are formatted with boxes and columns and look nothing like the invoices sent by Vista and maintained as its business records. For example, the COMMERCIAL forms include a box headed "Delivery Date"; and in each of those forms a date has been entered in that box. The Vista invoices have no such heading and no such information, likely because Vista sends the invoice to Sanchez when it ships the products (*see* Declaration of Omar Torres Sortillon dated September 2, 2021 ¶¶ 3-4); Vista ships the products to southern California; and from there, Sanchez imports them into Mexico (*see* First Fernando Decl. ¶¶ 9-10). The party in position to fill in a delivery date is Sanchez, not Vista.

Further, in the COMMERCIAL forms, the typeface of the date supplied in the delivery-date box appears to be the same as the typeface of the content entered on the rest of the form, which would permit an inference that all content in the COMMERCIAL forms was filled in by, or at the behest of, Sanchez. And in several respects, the COMMERCIAL forms' contents differ from the contents of the Vista

invoices that bear those invoice numbers. In more than a dozen of the same-numbered pairs, the invoice date on the Sanchez document does not match the invoice date on Vista's invoices. (*See, e.g.*, Invoices "3415867," "3415879," and "3415885": *Compare* A.145, 146, 147 (Sanchez) *with* A.549, 551, 554 (Vista).) In addition, several of Sanchez's COMMERCIAL forms show delivery dates that are suspect because they are earlier than the invoice date. (*See, e.g.*, Invoices 3415819 and 3415825, A.140 and 141.) And in virtually every same-numbered pair, the language used in describing the product differs.

Most importantly, only two of the Sanchez 2014 invoice documents--the two on Vista letterhead--include the instruction for Sanchez to remit payments to Vista in New York. Thus, in support of its claim that it had the right to pay by delivering cash to Rascón in Tijuana, nearly 95% of the documents Sanchez has submitted as purported Vista 2014 invoices--the authenticity of which, as discussed, may be in question--lack the instruction found in Vista invoices that instructed Sanchez to send payments to Vista corporate headquarters in New York.

A reasonable jury could find, *inter alia*, that Rascón lacked authority to receive cash payments in Tijuana for Sanchez's debts to Vista, that Sanchez lacked any reasonable belief that Rascón had such authority, and that Sanchez's proffered 2014

documents for the 39 invoices at issue were prepared by Sanchez and misrepresented its place-of-payment agreement with Vista by replacing Vista's invoices with the COMMERCIAL forms that lacked the instruction to send payments to Vista in New York. A jury could reasonably conclude that Sanchez's presentation was bogus, and disbelieve Sanchez's assertion that it had paid the amounts it owed Vista.

The district court stated that "Sanchez's assertion that it paid the [disputed 2014] invoices is further bolstered, of course, by Rascón's admission under oath that he received cash payment from Sanchez in satisfaction of the 39 disputed invoices, and by Rascón's signature on said invoices." *Vista I*, 627 F.Supp.3d at 420. While we reject Vista's contention that the district court abused its discretion in ruling Rascón's affidavit admissible as a statement against interest, it must be recognized that the admission of a document in evidence does not mean that the factfinder must credit it, and that mere admissibility is not a basis for a grant of summary judgment. The ultimate probative value of a document received in evidence is a matter to be assessed by the jury.

Juries are instructed that in assessing credibility and drawing inferences, they should exercise their common sense. A reasonable jury could be skeptical as to why a man who has just been fired would be motivated to sign an affidavit stating

that he had received in 2014 more than three quarters of a million dollars in cash belonging to the employer, but would be silent about having received cash in 2013--if he did, as Sanchez claims--for invoices that his employer does not claim were unpaid. The jury could be skeptical as to whether Rascón's statement that he received all of the missing 2014 cash that Sanchez claims it gave him was the truth, the whole truth, and nothing but the truth.

We also note the district court's statements that Sanchez's insistence that it had paid each of the disputed 2014 Vista invoices by delivering cash to Rascón was "supported by the declaration submitted by Fernando," 627 F.Supp.3d at 419, that this was "further supported by the declaration of Humberto," *id*. at 420, that it was "further bolstered" by the Rascón affidavit, *id*., and that there was a "substantial amount of . . . evidence in the record supporting the fact of Sanchez's payment," *id*. at 420 n.6. These statements suggest both that the court was weighing the evidence, rather than simply, as required, assessing its sufficiency to show an issue for trial, and that the court credited, instead of properly disregarding, evidence by the moving party Sanchez that the jury would not be required to believe.

We conclude that there were genuine issues of material fact precluding the grant of summary judgment in favor of Sanchez on the basis of its claim that it paid the disputed 2014 Vista invoices.

5. *Evidence as to the Foreseeability of Theft by Rascón*

We reach the same conclusion with respect to the district court's ruling that if Sanchez breached the contract by delivering cash to Rascón, it was nonetheless entitled to summary judgment on the basis that theft of the cash by Rascón was unforeseeable. Although an intervening intentional or criminal act will generally sever the causal chain between a contract breach and the nonbreacher's injury, that principle "has no application when the intentional or criminal intervention of a third party or parties is reasonably foreseeable." *Kush v. City of Buffalo*, 59 N.Y.2d 26, 33, 462 N.Y.S.2d 831, 835 (1983); *see generally Wakeman*, 101 N.Y. at 209, 4 N.E. at 266; *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 520-21, 429 N.Y.S.2d 606, 613-14 (1980); *Restatement (Second) of Torts* §§ 448, 449 (1965). The district court recognized that such a foreseeability issue is ordinarily a question for the jury, but it found "there is no evidence in the record that Sanchez could have reasonably foreseen that by paying

Rascón in cash, it would expose Vista to theft-related damages," *Vista I*, 627 F.Supp.3d at 421.

Although as discussed in Part II.C.3. above we see serious questions as to whether Sanchez, as it claims, in fact made cash payments to Rascón for payment of Vista invoices in 2013, for purposes of reviewing the district court's unforeseeability ruling we accept Sanchez's representations both as to its making such payments and as to the process by which it reached a decision to commit to making such payments. Accepting the Fernando declaration's description of that decision-making process as true for purposes of assessing foreseeability, we disagree with the district court's view of the record.

Humberto stated that, "for security reasons," in getting the money to Rascón, Sanchez made its cash deliveries only in "places owned or rented by" Sanchez--principally its offices or Humberto's home. (First Humberto Decl. ¶¶ 5-6.) But, being concerned not just for "safe[ty]" but also for "reliab[ility]" (First Fernando Decl. ¶ 31), Fernando stated that "Sanchez did not make cash payments so easily" (*id.* ¶ 50). Thus, as described in Part I.A. above, after Rascón told Sanchez repeatedly that "Vista"--or "he"--could receive payments of Sanchez's Vista bills in "cash" (*id.* ¶¶ 28-29), Fernando--who realized that Rascón "began giving us personalized

-64-

attention" only after becoming aware that Sanchez had a surfeit of cash (*id*. ¶ 27)-- describes proceeding **(a)** to "check[] with Vista," **(b)** to abstain from immediately adopting a cash-to-Rascón procedure although "Vista" in response had "said . . . no problem," **(c)** to make a "*first*" cash-to-Rascón payment, only after further prodding by Rascón, and doing so only on a "sample" basis, **(d)** to make its "*second*" payment also experimental, even after "Vista credited the [first] payment," **(e)** to make its "*third*" payment experimental, and **(f)** to make its "*fourth*" payment experimental. (*Id*. ¶¶ 27-37.) Fernando stated that only after "we saw that" Vista had "credit[ed Sanchez's] payment[s] . . . to Rascón in cash" "four" times, did Sanchez feel sufficiently reassured to commit to making cash payments to Rascón. (*Id*. ¶ 38; *see also id*. ¶ 50.)

In sum, the record shows that Sanchez was aware that Rascón had become more attentive to Sanchez only after learning that it had a lot of cash; that Rascón repeatedly told Sanchez that it could pay its Vista invoices in cash and said Sanchez could give that cash to Rascón; and that Sanchez essentially said, "Not so fast." We conclude that this record does not warrant a finding that Rascón's theft of the cash delivered to him for payment of Vista invoices was unforeseeable to Sanchez as a matter of law.

D.  *Vista's Other Claims and Contentions*

We reject Vista's contention that the district court erred in denying its motion for summary judgment against Sanchez.  The record on that motion, viewed in the light most favorable to Sanchez, and without credibility assessments in favor of Vista, shows that there are genuine issues of material fact for trial.

We also see no merit in Vista's challenge to the district court's dismissal of its alternative claims of breach of implied contract and promissory estoppel on the ground that those claims are normally duplicative of a claim based on a valid and enforceable express contract.  As there is no question that there was an express contract between Vista and Sanchez, we affirm the dismissal of those two claims.  *See*, *e.g.*, *Miller v. Schloss*, 218 N.Y. 400, 406-07, 113 N.E. 337, 339 (1916); *Grossman v. New York Life Insurance Co.*, 90 A.D.3d 990, 991-92, 935 N.Y.S.2d 643, 645 (2d Dep't 2011), *lv. dismissed*, 19 N.Y.3d 991, 951 N.Y.S.2d 105 (2012).

As to the claim of unjust enrichment, we vacate its dismissal but note that if Vista prevails at trial on its breach-of-contract claim, the unjust enrichment claim should then be dismissed as duplicative.  We decline to affirm the dismissal of the unjust enrichment claim at this stage, given the possibility that Vista might not prevail on its breach-of-contract claim, but that evidence emerging at trial might support a

claim for unjust enrichment that is not congruent with its claim for breach of contract. We emphasize, however, that a claim for unjust enrichment based only on the same conduct that underlies Vista's breach of contract claim would not be cognizable. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142, 879 N.Y.S.2d 355, 361 (2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded." (citing *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656 (1987))).

# CONCLUSION

We have considered all of the parties' contentions in support of their respective positions, and, except as indicated above, have found them to be without merit. The judgment of the district court is affirmed insofar as it denied Vista's motion for summary judgment in its favor and dismissed its claims of implied contract and promissory estoppel. To the extent that it dismissed Vista's claims of breach of contract and unjust enrichment, the judgment is vacated, and the matter is remanded for trial.